In the

# United States Court of Appeals
## For the Seventh Circuit

——————

No. 07-1589

TERESA HANCOCK,

*Plaintiff-Appellant,*

*v.*

JOHN E. POTTER, Postmaster General
of the United States Postal Service,

*Defendant-Appellee.*

——————

Appeal from the United States District Court
for the Northern District of Illinois, Western Division.
No. 02 C 50388—**Philip G. Reinhard**, *Judge.*

——————

ARGUED APRIL 3, 2008—DECIDED JUNE 24, 2008

——————

Before FLAUM, MANION, and TINDER, *Circuit Judges.*

FLAUM, *Circuit Judge.* Theresa Hancock worked for the U.S. Postal Service and suffered a lumbar strain while on the job. After going through a series of examinations designed to assess her ability to perform certain physical tasks on the job, she was given a new set of duties. She had disagreements with her supervisors regarding whether her new tasks ran afoul of her physical restrictions. These disagreements ultimately formed the basis of her complaint in the district court alleging gender discrimination, disability discrimination, retaliation, and a hostile work environment. The district court dismissed

Hancock's claims on summary judgment in large part because she did not suffer an adverse employment action and she could not identify a similarly situated employee. Because we find no error in the district court's analysis, we affirm.

## I. Background

From 1992 to 2001, Hancock was employed with the U.S. Postal Service in Rockford, Illinois as a "flat sorter." The job involved utilizing and maintaining a flat sorting machine that would organize and separate pieces of mail larger than letter-size, such as magazines, newspapers, and manila envelopes. The first several years of her employment with the Postal Service were uneventful, save for an award she received early on for discharging her duties in a safe manner.

Hancock's troubles began in March 1998, when she filed a grievance alleging that her supervisor, Leon Woods, yelled at her and was disrespectful towards her. A month later, this grievance was settled. Then, on June 18, 1999, Hancock suffered a job-related back injury, namely a lumbar strain. This injury limited her ability to bend, stoop, and twist. Consistent with Department of Labor requirements, she was given a limited duty job assignment that modified the nature of her work. Soon after working this modified job, she told a supervisor that it did not comport with restrictions set out in her limited duty assignment.[1] Supervisors examined her restrictions and disagreed; they told her to keep working. In response,

---

[1] These restrictions were as follows: lifting and carrying limited to 50 pounds, twisting limited to no more than 12 tubs per 15 minutes, and no pushing greater than 475 pounds.

Hancock asked for a union representative, and was given one within four hours. She utilized the union assistance to document her injury, but she did not request medical treatment.

Hancock then made an appointment to see her own physician. At the same time, the Postal Service had her attend a fitness-for-duty examination to determine her ability to work, and to clarify the extent of her restrictions. The Postal Service physician completed a new duty status report which delineated Hancock's restrictions. She was given a corresponding new job offer that involved working on a different piece of equipment—the meter belt. Hancock refused to accept the new assignment on the grounds that, in her view, it would trigger her injury. The Postal Service physician assessed the information a second time and confirmed that she could perform this new job in a manner that was consistent with her restrictions. But Hancock still refused. She then received a note from her personal physician excusing her from work for a few days until he had the chance to examine her. When she returned to work, she came with a note from her physician directing that she not work the meter belt. Because her injury had worsened since June, she was given a new, more stringent set of restrictions that also called for her to refrain from working on the meter belt. As a result, Hancock was given a job offer for a different shift, because there as no work available on her shift that also met her restrictions.[2]

---

[2] Postal Service Regulations require that if adequate duties are not available within the employee's work limitation tolerances, in the craft and work facility to which the employee is regularly assigned, and within her regular house of duty, other work may be assigned within the facility.

While she was on her restrictions, Hancock requested to work in an area known as the Registry Cage. This is a secure section on the workroom floor where a single employee works. Her request was denied for two reasons. First, the Postal Service determined that additional staffing for this position was only needed on Hancock's regular day off. Second, despite Hancock's contrary belief, the Postal Service concluded that the work requirements of the Registry Cage were outside her restrictions. For instance, the duties included lifting up to 70 pound bags of coin, which was clearly beyond Hancock's restrictions.

Hancock also wanted to participate in the Associate Supervisor Program (a management trainee program) but was ultimately denied. This was due, in large measure, to an unfavorable evaluation issued by the Manager of Distribution Operations, Linda Medearis, on August 4, 1999. Hancock claims that she received this negative evaluation because she had filed grievances and had complained about management and her supervisors. Critically, none of these grievances was the subject of an Equal Employment Opportunity ("EEO") complaint that took place prior to August 4, 1999. Indeed, Medearis claims that she did not select Hancock for the program because a number of co-workers had indicated that she was not doing her job. This is consistent with prior events: Medearis also did not recommend Hancock for this program in the March 1999 cycle, before the injury and accompanying work restrictions, and before she started filing administrative complaints.

Contemporaneous with these events, Hancock filed an injury compensation claim with the Office of Workers Compensation ("OWCP"). All of the documentation

received by the Postal Service Injury Compensation Specialist concerning Hancock's injury was forwarded to OWCP. Then, on October 18, 1999, OWCP notified Hancock that her claim was denied due to insufficient medical documentation.[3] She was subsequently reclassified from a "limited duty" status (which is for employees who are injured on the job) to a "light duty" status (which is for employees who are injured outside of their job duties). This meant that her workload was reduced to 20 hours per week and that her availability to be assigned beyond these hours depended on available work that was within her restrictions. Later, on February 11, 2000, OWCP reversed its decision because it located a treatment note from Hancock's physician. This took her from light duty back to limited duty, which meant that her full time work hours were restored.

From August 1999 to April 2000, Hancock filed several complaints with the Equal Employment Opportunity Commission ("EEOC") alleging discrimination based on sex, physical disability, age, and retaliation for prior EEO activity. In the context of these complaints, she made the following six claims: (1) her limited duty job restrictions were violated; (2) her request to be trained in the Registry Cage was not honored in order to harass her and deny her an accommodation for her disability; (3) she was harassed and denied accommodations when presented with job offers; (4) her work hours were reduced;

---

[3] The Federal Employees Compensation Act, 5 U.S.C. § 8101, *et seq.*, holds the employee responsible for: (1) establishing that the injury occurred while on the job, (2) proving that the medical condition is causally related to the injury, and (3) submitting a medical report from an attending physician.

(5) she was given an unfavorable evaluation for the Associate Supervisor Program; and (6) injury compensation personnel withheld medical information in her worker's compensation cases. After exhausting her administrative remedies, Hancock filed a complaint with the district court consistent with this set of claims in October 2002. Specifically, she alleged that the Postal Service discriminated against her on the basis of gender in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.*, on the basis of disability in violation of the Americans with Disabilities Act ("ADA"),[4] on the basis of age in violation of the Age Discrimination in Employment Act ("AEDA"), and that the Postal Service retaliated against her for speaking out against a practice that Title VII forbids. After an answer was filed, the Postal Service moved for summary judgment on February 1, 2006. The district court granted this motion in favor of the Postal Service. This appeal followed.

## II. Discussion

Hancock raises four issues before this Court. She argues that the district court erred in denying her gender discrimination, disability discrimination, retaliation, and hostile work environment claims. We analyze each issue in turn, bearing in mind that we review a district court's grant of summary judgment de novo and view the evidence in the light most favorable to the appellant. *Hoffman v. MCA, Inc.*, 144 F.3d 1117, 1121 (7th Cir. 1998).

---

[4] The term "employer" under the ADA specifically excludes the United States and its agencies from its definition, 42 U.S.C. § 12111(5)(B), and so Hancock should have actually sued under the Rehabilitation Act, 29 U.S.C. § 794.

Because Hancock did not provide any direct or circumstantial evidence of gender discrimination, in order to make a colorable claim, she had to prove that (1) she was a member of a protected class; (2) she was meeting her employer's legitimate business expectations; (3) she suffered an adverse employment action; and (4) the employer treated a similarly situated employee outside of the class more favorably. *Kampmier v. Emeritus Corp.*, 472 F.3d 930, 939 (7th Cir. 2007). Upon establishing these elements, the burden shifts to the employer to produce "evidence which, taken as true, would permit the conclusion that there was a nondiscriminatory reason for the adverse action." *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 509 (1993). If the employer succeeds here, then the burden shifts back to the employee to prove that these reasons were merely a pretext for discrimination. *E.E.O.C. v. Our Lady of the Resurrection Medical Center*, 77 F.3d 145 (7th Cir. 1996).

Hancock's gender discrimination claim fails at the outset because she did not suffer an adverse employment action and because she could not point to a single similarly situated employee outside the class who was treated more favorably. An adverse employment action is one that significantly alters the terms and conditions of the employee's job. *Griffin v. Potter*, 356 F.3d 824, 829 (7th Cir. 2004). General hostility, unless it was severe and pervasive, does not meet the mark. *Id*. The action must be more disruptive than a mere inconvenience or an alteration of job responsibilities. *Rabinovitz v. Pena*, 89 F.3d 482, 488 (7th Cir. 1996). Given this framework, it is clear that Hancock cannot meet her burden. Nearly all of the so-called adverse employment actions that Hancock raises were merely attempts by the Postal Service to ensure that

she provided it with work but did not work beyond
her personal restrictions. This is certainly true of her
supervisor's decision to subject her to fitness-for-duty
examinations (which is required) and subsequent dis-
agreements regarding whether work on the meter belt
violated her restrictions. Also, Hancock protests that her
work hours were reduced, but this was simply due to the
fact that there was a lack of available work that fell
within her very limiting restrictions. We could exhaus-
tively critique each of Hancock's complaints in this way,
but we need not do so because there is an even more clear-
cut flaw in her case: she has not provided this Court, or
the district court, with a single similarly situated em-
ployee. There is no evidence in the record that indicates
that Hancock's supervisor acted differently when faced
with a disagreement from any other employee about
whether an assignment was within their restrictions, nor
is there evidence that Postal Service supervisors acted
differently when assessing what productive work was
available for Hancock. Hancock provides conclusory
affidavits from co-workers that state that other employees
were given better treatment, but not a single actual name
is provided. For all of these reasons, Hancock falls well
short of making her *prima facie* case of gender discrimina-
tion.

Hancock's disability discrimination claim fares no
better, because she was not disabled as that term is defined
in the ADA. In order to establish her case here, Hancock
had to show that (1) she has a physical or mental im-
pairment which substantially limits one or more of her
major life activities; (2) she has a record of such impair-
ment; or (3) she is regarded as having such impairment
by her employer. *Peters v. City of Mauston*, 311 F.3d 835,

842 (7th Cir. 2002). What undermines Hancock's claim here is that she has not adduced any evidence that any of her major life activities were affected by her injury. *See* 29 C.F.R. § 1630(i) (noting that caring for one's self, performing manual tasks, seeing, walking, speaking, hearing, breathing, leaning, and possibly working, are major life activities). Hancock merely had a work-related back injury that temporarily limited her ability to perform certain job duties and short-term absences. But even if Hancock could somehow establish that she was disabled under the ADA, her claim would still fail on the grounds that she cannot point to a single similarly situated employee outside the protected class who was treated more favorably.

In order to prevail on her retaliation claim, Hancock had to prove that the Postal Service took an adverse action against her because she opposed a practice that Title VII forbids. *Kampmier*, 472 F.3d at 939. Here, Medearis did make written and oral comments in March and August 1999 that one of the reasons she did not recommend Hancock for the Associate Supervisor Program, in addition to statements made by co-workers that she was not doing her job, was the fact that she had "filed grievances claiming harassment from [management]." Hancock magnifies this comment and argues that within one month of complaining about discriminatory treatment, Medearis acted to deny her an appointment to the program. This statement is not consistent with the facts. Hancock did in fact complain to Medearis in August 1999 about the treatment she was receiving from her supervisor Leon Woods, and Medearis did in fact give Hancock a negative evaluation for the program later that month. However, Medearis also gave Hancock a similarly

negative evaluation for the program five months earlier, in March. This was before Hancock lodged any complaints and, more importantly, before she engaged in any EEO-related activity.[5] Moreover, Medearis's statements did not mention that Hancock complained of discrimination—she generally referred to "grievances," and her statement was made in the context of describing Hancock's "very negative attitude" towards management.

Hancock's only real response here is an attempt to recharacterize her March 1998 grievance against her supervisor (for raising his voice at her) as prior EEO activity. She contends that it was this grievance that formed the basis of Medearis's negative evaluation. This re-reading of the events in this case is not persuasive. First, Hancock did not base any of her five EEO complaints (starting in August 1999) on an allegation that this March 1998 grievance was prior EEO activity for which she was retaliated against. Second, and consistent with this view, her district court complaint also only refers to prior EEO activity in 1999. There is no mention of EEO activity that occurred in 1998. Third, and most significantly, Hancock filed this grievance because her supervisor was "disrespectful towards her." There was no evidence, or even an allegation, that this disrespect was fueled by a discriminatory animus.

In the alternative, Hancock tries to establish her claim of retaliation by utilizing the burden-shifting approach articulated above. She was required to show "that (1) after lodging a complaint about discrimination,

---

[5] Hancock began filing complaints with the EEOC in August 1999.

(2) only [she], and not otherwise similarly situated employees who did not complain, was (3) subjected to an adverse employment action even though (4) [she] was performing [her] job in a satisfactory manner." *Id.* at 642. Like her gender and disability discrimination claims, Hancock's attempt to make out a *prima facie* case falls short because she has not identified a similarly situated non-complaining employee, much less presented convincing evidence that such an employee was treated more favorably.

As a part of her hostile work environment claim, Hancock had to demonstrate that the conduct complained of was "sufficiently severe or pervasive to alter the conditions of employment and create an abusive working environment." *Ezell v. Potter*, 400 F.3d 1041, 1047 (7th Cir. 2005). In Hancock's case, she had to show that she was subjected to unwelcome harassment based upon either her gender or disability. *Beamon v. Marshall & Isley Trust Co.*, 411 F.3d 854, 863 (7th Cir. 2005). We decline to reach the substance of Hancock's hostile work environment claim because she never alleged such a claim in her district court complaint. It was raised for the first time in her opposition to the Postal Service's motion for summary judgment, and so it is not properly before this Court. *See Shanahan v. City of Chicago*, 82 F.3d 776, 781 (7th Cir. 1996).

We acknowledge that plaintiff's working environment was not the most supportive. Her supervisor criticized her, she complained, and her manager viewed her as an employee who, among other things, was not a "team player." However, at every step of the way, Hancock was not able to shore up any bit of evidence that indicated that she was discriminated against on the basis of

her gender or disability or that she was retaliated against because she complained of discrimination. She was injured and inconvenienced. She was treated somewhat unkindly. But there is a significant gap between such conduct, which was fundamentally personal, and discrimination.

### III.  Conclusion

For the foregoing reasons, we AFFIRM the district court's judgment.