In the

# United States Court of Appeals

## For the Seventh Circuit

No. 21-1257

ALICE ROBBINS HUFF,

*Plaintiff-Appellant*,

*v.*

PETE BUTTIGIEG, Secretary of Transportation,

*Defendant-Appellee*.

Appeal from the United States District Court for the
Southern District of Indiana, Indianapolis Division.
No. 18-cv-2929 — **Richard L. Young**, *Judge*.

ARGUED JANUARY 5, 2022 — DECIDED JULY 28, 2022

Before KANNE,* WOOD, and BRENNAN, *Circuit Judges*.

BRENNAN, *Circuit Judge*. Alice Robbins Huff worked for the
Federal Aviation Administration in a position that required
her to follow a strict alcohol and drug policy. She violated that
policy when she was arrested for an alcohol-related offense.

---

* Circuit Judge Michael Kanne died on June 16, 2022, and he did not par-
ticipate in the decision of this case, which is being resolved under 28 U.S.C.
§ 46(d) by a quorum of the panel.

By self-reporting this infraction, she avoided immediate disciplinary action, but only if she completed a rehabilitation plan designed and supervised by the FAA.

Huff agreed to a rehabilitation plan but, for religious reasons, objected to its requirement that she attend Alcoholics Anonymous meetings. When an accommodation was not immediately made, she contacted the FAA's Equal Employment Opportunity counselor to complain of religious discrimination. Even after the FAA approved her participation in an alternate recovery program, Huff filed a formal complaint against the agency. She alleged religious discrimination and specifically named Ava Wright, an employee responsible for overseeing her rehabilitation plan, as the discriminatory actor. Huff and Wright did not get along. On multiple occasions, they disagreed about whether the plan required Huff to request medication approvals over the phone or email—a dispute that culminated in Huff receiving formal notice of noncompliance. This notice triggered a process that ended in Huff's removal from her job.

Huff sued the FAA, alleging it violated Title VII by retaliating against her for filing a formal complaint of religious discrimination. She also maintained that she fully complied with the rehabilitation plan's terms. The agency disputed this and defended its decision to remove Huff on the ground that she refused to follow the proper procedures for seeking medication approval.

The district court granted summary judgment to the FAA, ruling that Huff failed to establish a causal link between the formal complaint and her termination. Much of Huff's complaint focused on Wright, who lacked actual authority to fire Huff. In the court's view, independent assessments by other

FAA staff members insulated the agency from any animus on Wright's part. We disagree. A reasonable juror could conclude that retaliatory animus influenced Wright's decision-making and proximately caused Huff's termination. So, we reverse and remand to the district court for further proceedings.

## I. Background

As an FAA employee, Huff processed flight data, provided communication services to aircraft, and operated air traffic computer systems. Because this role entailed "critical safety or security responsibilities," the FAA classified it as a "testing designated position." Employees in such positions must follow additional standards of conduct, codified in Department of Transportation Order 3910.1D,[1] including a prohibition on inappropriate or illicit off-duty alcohol use. Off-duty alcohol misuse that results in an arrest constitutes a violation. The FAA warns employees that alcohol-related arrests "indicate[] irresponsibility and lack of judgment" and place the employee's job in "jeopardy."

An employee who violates the FAA's alcohol-use rules may avoid immediate disciplinary action by self-referring for treatment. She must follow a rehabilitation plan designed by the Employee Assistance Program, a service within the FAA tasked with, among other things, creating and implementing

---

[1] Order 3910.1D, entitled "Drug and Alcohol-Free Departmental Workplace Program," is a byproduct of Executive Order No. 12,564 (Sept. 15, 1986), 5 U.S.C. § 7301 note, and the Omnibus Transportation Employee Testing Act of 1991, Pub. L. No. 102-143, 105 Stat. 952 (1991). Together, the executive order and the Act instruct agencies to implement plans for establishing and maintaining drug- and alcohol-free workplaces. Order 3910.1D is the Department of Transportation's response to those directives.

rehabilitation plans for employees who violate alcohol-use rules. If the employee refuses to enter the rehabilitation program, fails to successfully complete it, or fails to "adher[e] to the terms of the rehabilitation plan," the FAA initiates a removal action. Under Order 3910.1D, "[t]here is no opportunity to enter a rehabilitation program" for failing to enter, complete, or adhere to a rehabilitation plan.

In April 2016, Huff was arrested for operating a vehicle while intoxicated. The next day, she promptly reported the arrest to her supervisor, who referred her to the Employee Assistance Program. Huff's first point of contact was Ava Wright, the Employee Assistance Program manager for the Great Lakes Region. Wright requested documentation and, in coordination with the regional Flight Surgeon's office, sent Huff a proposed rehabilitation plan.

The rehabilitation plan's opening paragraph declared, "I understand that my failure to abide with any condition of my [plan] will result in a determination of non-compliance and a referral to management for disposition, which may result in a proposed removal action and a final opportunity for treatment and rehabilitation." The plan clarified that "compliance mean[t] a strict adherence" to its terms. Pertinent provisions are summarized below.

*Prohibitions and obligations.* Among other things, the plan required Huff to:

- abstain from alcohol and illegal drugs;

- attend outpatient treatment;

- participate in a continuing care program after outpatient care ended;

- attend weekly meetings with her individual case manager for 16 weeks (the meetings then reduced in frequency);

- attend two Alcoholics Anonymous ("AA") meetings per week;

- obtain and meet with an AA sponsor; and

- submit to random drug and alcohol testing.

*Medication approval.* The plan also regulated Huff's medication use, stating that "some medications, though deemed appropriate for a medical condition, may adversely affect successful completion" of the rehabilitation program. To that end, the rehabilitation plan required Huff to secure FAA approval—through the Flight Surgeon's office—before using any prescription or over-the-counter medication, except in emergency situations. In the case of an emergency, she agreed "to report such use of medication after the emergency and prior to the resumption of safety-sensitive duties." She further agreed "to telephone the [Flight Surgeon]" using the numbers provided.

*Excused absences.* If Huff needed to miss a meeting or an appointment, the plan required her to "obtain an excused absence" by "hav[ing] a conversation (over the phone, by text message or email) with [Wright] and obtain[ing] her written or verbal approval."

After reviewing the proposed rehabilitation plan, Huff, a Jehovah's Witness, made a religious objection to the plan's AA-related requirements. She emailed this objection to Wright, but the record does not reflect whether Wright responded. Huff signed the plan two days later but raised her objection again during a conference call with Wright and

others, during which the participants discussed the plan's requirements. According to Huff, Wright rebuffed her objection to the AA-related requirements, informing Huff that she would only honor her objection if she was an atheist.

Less than two weeks later, Huff contacted the FAA's Equal Employment Opportunity counselor to report religious discrimination.[2] By email, the EEO counselor notified Matthew Amato, a human resources manager, about Huff's decision to "enter[] the EEO Complaint Process." Amato then forwarded this email to Wright, who replied, "[Huff] is very angry and upset that she has to complete this one year program." As to the alleged religious discrimination, Wright told Amato she would "begin researching alternative programming" to replace AA attendance. But Amato instructed Wright to hold off on telling Huff about any alternatives in case they needed those options in mediation. Wright agreed.

On August 24, 2016, the FAA issued Huff an amended rehabilitation plan, allowing her to attend an alternate recovery program in lieu of AA meetings. But the internal investigation

---

[2] A federal employee who believes she has been subjected to unlawful discrimination must first "try to resolve the matter informally by consulting an Equal Employment Opportunity counselor." *Poullard v. McDonald*, 829 F.3d 844, 849 (7th Cir. 2016) (citing 29 C.F.R. § 1614.105(a)). "If informal counseling fails, the employee [may] then file a formal complaint." *Id.* at 850 (citing 29 C.F.R. § 1614.106). If the agency rules against the employee, she may file a civil action in federal district court, with the option of appealing to the Equal Employment Opportunity Commission first. 42 U.S.C. § 2000e-16(c). Huff contacted an EEO counselor on July 21, 2016, filed a formal complaint on October 28, 2016, received an unfavorable agency decision on April 19, 2017, appealed to the Equal Employment Opportunity Commission on May 17, 2017, and filed this lawsuit on September 21, 2018.

into Huff's complaint of religious discrimination continued. Ultimately, informal resolution failed, and Huff received notice of her right to file a formal complaint. She exercised that option in October 2016, this time alleging discrimination based on race, sex, age, religion and disability.

As part of the investigation, in March 2017, Wright drafted and submitted an affidavit recounting her version of events. While working on that document, she forwarded a copy of Huff's formal complaint to her husband, who did not work for the FAA. When asked why she did this, she answered that it was to explain the reason for her being "unavailable."

Meanwhile, tension arose between Huff and the FAA about the way in which she sought clearance for medications. Per the FAA, the rehabilitation plan required Huff to request medication approval over the phone and not by email. That was not Huff's understanding. Between July 2016 and August 2017, Huff sent several email requests to Wright and the Deputy Flight Surgeons, although she asserted at her deposition that these emails were accompanied by contemporaneous phone calls.

In July 2016, Huff emailed Dr. Joye Holmes, a Deputy Flight Surgeon authorized to approve medication, and informed her about several over-the-counter medications she was taking. Dr. Holmes responded that they were all approved.

Huff made three more email requests over the next year, initially addressing them to Dr. Holmes, and eventually to both to Dr. Holmes and Wright. In her requests, Huff sought approval for various over the counter and prescribed medications. She also asked for "specific reasoning" if a medication

was not approved. Dr. Holmes responded by email, indicating if medications were approved or disqualified. For further explanation Huff was directed to "call the telephone numbers provided." In response to her email requests, Dr. Holmes reminded Huff that she should request medication approval by calling the numbers provided in the plan and "not by email." And Wright responded to one email request via voicemail, instructing Huff to follow rehabilitation plan guidelines by calling the telephone number in the rehabilitation plan.

Finally, on August 10, 2017, Huff sent an email to Dr. Holmes, Wright, and one other individual. This email described an upcoming surgery Huff had scheduled that would involve pain medication. Huff asked for a response, in writing, confirming the amount of time these drugs would remain in her system, given the possibility for a random drug test. She also asked for an excused absence from her alcohol recovery classes during the week following the surgery.

The next day, Wright forwarded the email to Dr. Robert Ruiz, a Deputy Flight Surgeon who was handling noncompliance matters. Wright asked for Dr. Ruiz's thoughts on issuing Huff a noncompliance memorandum. Before receiving a response from Dr. Ruiz, Wright emailed her assistant, informing her that she was "going to write a non-compliance memo based on [Huff's] failure to call Aerospace Medicine for medication questions." Dr. Ruiz later approved the issuance of a noncompliance memo, and Wright told him she would "prepare a document."

Having not received a response to her August 10, 2017 email, Huff contacted the Aviation Medical Examiner in Indianapolis, seeking approval for the pain medication. She later informed Wright that the Aviation Medical Examiner's office

replied within one and a half hours, and Huff expressed her view that Wright and Dr. Holmes "refuse[d] to assist" her. Huff insisted that Wright confirm the Aviation Medical Examiner's assessment in a written response. She also criticized Wright for calling her at noon the day prior because Wright was "well aware" of her work schedule (Huff worked the night shift). According to Wright, the purpose of the call was to instruct Huff to seek medication-use approval over the telephone, not email. The parties dispute whether Huff ever returned Wright's call.

Wright completed a draft of the noncompliance memo and sent it to Dr. Holmes and Dr. Ruiz, the two Deputy Flight Surgeons for the region. It was issued to Huff the next day. Although the government contends the noncompliance memo was approved by the regional Flight Surgeon, Dr. Schall, or either Dr. Holmes or Dr. Ruiz, the record is equivocal on this point.[3]

The memo informed Huff that she was in "noncompliance of [her] Treatment and Rehabilitation Plan" for violating the medication-approval provision. In several pages, the memo

---

[3] The FAA points to two places in the record purporting to show the noncompliance memo was approved by a member of the Flight Surgeon's office. The first is a portion of Wright's deposition testimony, where she discussed an email exchange between her and Dr. Ruiz about Huff's alleged noncompliance. But this dialogue only establishes that Ruiz approved Wright's suggestion to draft a noncompliance memo, not that he ever approved the final version issued to Huff, although Wright acknowledged that such approval was required. The second record citation highlighted by the FAA is deposition testimony from Dr. Holmes, who was asked by counsel, "[d]o you recall if you provided any changes or input to [Wright] before [the noncompliance memo] was issued to [Huff]." She answered, "I don't recall that I did."

described Huff's emails and the FAA's reminders that phone calls were required. The memo also disapproved of her attempt to circumvent the proper channels by seeking medication approval from the Aviation Medical Examiner's office.

The noncompliance memo was provided to Jessica Murphy, a human resources specialist, in the Employee and Labor Relations department. Murphy was not aware that Huff had met with an EEO counselor. As part of her review, Murphy asked Wright for supporting evidence and consulted with her supervisor, who told her to follow Order 3910.1D's procedures.

Murphy and her supervisor interpreted Order 3910.1D to require Huff's removal because she failed to "adhere" to the rehabilitation plan's terms—an event which required the FAA to initiate a removal action. So, Murphy drafted a notice of proposed removal. Neither Murphy nor her supervisor independently assessed whether Huff had violated the rehabilitation plan; they relied solely on the noncompliance memo drafted by Wright. Once it was complete, Murphy sent the draft to Huff's supervisor, Charles "Randy" Smith. He signed it and issued it to Huff on October 10, 2017.

The proposed removal explained that Smith sought to remove Huff from her position because she failed to comply with the rehabilitation plan's terms. Like the noncompliance memo, the proposed removal described Huff's email requests for medication approval after being asked to make such requests over the phone. It also recounted her attempt to obtain approval from an office other than the Flight Surgeon's office.

The notice provided Huff with the option to reply within 15 days and to submit affidavits or other documentary

evidence. It further stated, "[f]ull consideration will be given to any reply you choose to submit." After a reply, or 15 days, the notice informed Huff that a written decision would be issued. The memo also informed Huff that she was eligible for a rehabilitation program[4] and that her "willingness to participate" in that program would be "favorably considered" when the FAA made a final decision.

Huff chose to reply by letter from her attorney. She contended that the rehabilitation plan did not expressly require telephone communication, and thus there was no basis for noncompliance or removal.

Murphy considered Huff's response and the FAA's options. Murphy and Smith opposed removal. But after speaking with her supervisor, Robert Madison, Murphy informed Smith that the process was "mechanical" and, because Huff did not accept a "management referral [rehabilitation program]," she must be removed. Smith opined that "[i]t doesn't sound like we are concerned about the employees' condition and recovery. … [M]y experience tells me this is a loser." Nevertheless, on December 11, 2017, Huff was removed from federal service.

After exhausting her administrative remedies, Huff sued the FAA in federal district court, alleging sex, race, age, and disability discrimination and retaliation for engaging in a protected activity. She later amended her complaint, keeping only the retaliation claims under Title VII, the Age Discrimination in Employment Act, and the Rehabilitation Act. The

---

[4] Order 3910.1D says "[t]here is no opportunity to enter a rehabilitation program for this offense." It is thus unclear whether the proposed removal was accurate in even offering Huff a second rehabilitation program.

district court granted summary judgment to the government, primarily because Huff was "unable to show, as a matter of law, a causal connection between the filing of her EEO Complaint and her termination." On appeal, Huff focuses on her Title VII retaliation claim, and thus forfeits the others. *Scheidler v. Indiana*, 914 F.3d 535, 540 (7th Cir. 2019). Our task is to decide whether, under Title VII, Huff provided enough evidence to permit a reasonable juror to conclude that the FAA's decision to fire her was retaliatory and thus not "free from any discrimination based on … religion." 42 U.S.C. § 2000e-16(a).

## II. Causation

Before reaching the merits, we pause to clarify the appropriate causation standard in federal-sector retaliation cases. Congress amended Title VII in 1972 "to extend the protection of the Act to employees of the federal government," *Rennie v. Garrett*, 896 F.2d 1057, 1059 (7th Cir. 1990), which now contains separate federal-sector and private-sector provisions. *Compare* 42 U.S.C. §§ 2000e-2, 2000e-3, *with id.* § 2000e-16. By express design, the private-sector provisions do not apply to federal employees; rather, they govern "employer[s]," a term that "does not include … the United States." *Id.* § 2000e. While the private-sector provisions expressly prohibit retaliation, *id.* § 2000e-3, the federal-sector provision does not, *see id.* § 2000e-16. *Gomez-Perez v. Potter*, 553 U.S. 474, 487–88 (2008) (making this observation).

Nevertheless, given the 1972 amendment's ostensible goal—extending Title VII's protections to federal employees—federal courts have routinely assumed that Title VII prohibits the federal government from retaliating against its employees for engaging in protected activities. *See, e.g., Green v.*

*Brennan*, 578 U.S. 547, 551 n.1 (2016) ("We assume without deciding that it is unlawful for a federal agency to retaliate against a civil servant for complaining of discrimination."); *Reynolds v. Tangherlini*, 737 F.3d 1093, 1099 n.3 (7th Cir. 2013) ("We previously have assumed that the federal-sector provision of Title VII … encompasses a claim for retaliation."). It is common in these cases for the federal government, as the defendant-employer, to concede that Title VII prohibits retaliation, and it did so here. Appellee's Br. at 25 n.6. Because courts have assumed without deciding that Title VII's federal-sector provisions prohibit retaliation, the source of this prohibition has remained unidentified.

Recent Supreme Court decisions now require us to define the source of a federal-sector retaliation claim. In *Babb v. Wilkie*, the Supreme Court held that the language "free from any discrimination based on age" in the Age Discrimination in Employment Act's ("ADEA") federal-sector provision did not require but-for causation; rather, evidence that age played a part in an employment decision was sufficient for liability. *Babb v. Wilkie*, 140 S. Ct. 1168, 1171 (2020). The federal-sector provisions in the ADEA and Title VII are identical, so we have no trouble concluding, as did the Eleventh Circuit, that *Babb*'s causation standard applies equally to 42 U.S.C. § 2000e-16. *Babb v. Sec'y, Dep't of Veterans Affs.*, 992 F.3d 1193, 1205 (11th Cir. 2021). In private-sector cases, by contrast, proof of but-for causation is required. *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 360 (2013).

The source of a federal-sector retaliation claim matters, then, because private and federal employees face different causation standards under Title VII. One would reasonably assume that the source is the federal-sector provision,

§ 2000e-16. But some courts, including ours, have held that § 2000e-16 incorporates § 2000e-3 by reference.[5] If this is true, perhaps the rules (including the causation standard) of private-sector retaliation cases apply to the federal sector. Conversely, if § 2000e-16 prohibits retaliation (even though it does not expressly say so) then *Babb*'s standard would apply.

To answer this question, we look first to our case law. This court's approach to federal-sector retaliation claims has been inconsistent. Sometimes, this court has applied the standards developed in private-sector retaliation cases without mentioning the differences between federal and private employees.[6] Other times, without explanation, this court has cited directly to the private-sector antiretaliation provision, even though that provision does not apply to the government.[7] *See*

---

[5] *See, e.g.*, *Rochon v. Gonzales*, 438 F.3d 1211, 1219 (D.C. Cir. 2006); *Hale v. Marsh*, 808 F.2d 616, 619 (7th Cir. 1986) ("Technically the suit is under 42 U.S.C. § 2000e-16 rather than 2000e-3(a), because 2000e-16 is the only provision under which agencies of the federal government can be sued. However, 16 has been interpreted to incorporate 3(a).") (citing *Ayon v. Sampson*, 547 F.2d 446, 450 (9th Cir. 1976)).

[6] *See, e.g.*, *Abrego v. Wilkie*, 907 F.3d 1004, 1014 (7th Cir. 2018); *Vaughn v. Vilsack*, 715 F.3d 1001, 1006 (7th Cir. 2013); *Coleman v. Donahoe*, 667 F.3d 835, 859 (7th Cir. 2012); *Hancock v. Potter*, 531 F.3d 474, 479 (7th Cir. 2008); *Jordan v. Summers*, 205 F.3d 337, 343 (7th Cir. 2000).

[7] *Moreland v. Nielsen*, 900 F.3d 504, 507 (7th Cir. 2018); *Lewis v. Wilkie*, 909 F.3d 858, 866 (7th Cir. 2018); *Poullard*, 829 F.3d at 856; *Formella v. Brennan*, 817 F.3d 503, 514 (7th Cir. 2016); *Boss v. Castro*, 816 F.3d 910, 916 (7th Cir. 2016); *Jaburek v. Foxx*, 813 F.3d 626, 633 (7th Cir. 2016); *Atanus v. Perry*, 520 F.3d 662, 677 (7th Cir. 2008); *Lapka v. Chertoff*, 517 F.3d 974, 978 (7th Cir. 2008); *Nair v. Nicholson*, 464 F.3d 766, 769 (7th Cir. 2006); *Mlynczak v. Bodman*, 442 F.3d 1050, 1060–61 (7th Cir. 2006); *Johnson v. Sullivan*, 945 F.2d 976, 980 (7th Cir. 1991).

*id.* §§ 2000e, 2000e-3. In both areas, we framed the causation inquiry as a requirement that the plaintiff establish a "causal link" or "causal connection" between a protected activity and an adverse employment action.

To identify the source of a federal-sector retaliation claim, we rely on *Gomez-Perez*, another ADEA case decided by the Supreme Court. There, the Supreme Court held that the ADEA's federal-sector provision prohibited retaliation, explaining that "retaliation for complaining about age discrimination is 'discrimination based on age.'" *Gomez-Perez*, 553 U.S. at 488. As noted above, the ADEA and Title VII federal-sector provisions share identical language. *Id.* at 487 ("The ADEA federal-sector provision was patterned 'directly after' Title VII's federal-sector discrimination ban."). So, we apply *Gomez-Perez*'s reasoning to Title VII and hold that § 2000e-16 also prohibits retaliation. Under *Babb* and *Gomez-Perez*, then, we conclude that § 2000e-16 prohibits retaliation when it "plays a part in a federal employment decision." *Babb*, 140 S. Ct. at 1175; *see also Tonkyro v. Sec'y, Dep't of Veterans Affs.*, 995 F.3d 828, 835 (11th Cir. 2021) (reaching the same conclusion).

Although but-for causation is not required for liability in federal-sector retaliation cases, it remains "important in determining the appropriate remedy." *Babb*, 140 S. Ct. at 1177. To secure "reinstatement, backpay, compensatory damages, or other forms of relief related to the end result of an employment decision," a plaintiff must show that but for the retaliation, the employment action would not have occurred. *Id.* "[P]laintiffs who demonstrate only that they were subjected to unequal consideration" cannot obtain those remedies. *Id.*

**III. Discussion**

With this clarification of the causation standard, we turn to the merits, reviewing the district court's summary judgment de novo. *Kopplin v. Wis. Cent. Ltd.*, 914 F.3d 1099, 1102 (7th Cir. 2019). The district court ruled for the FAA, finding no triable issue of fact as to causation. As explained above, the district court did not apply the appropriate causation standard. On its own, that may require a remand. *See Tonkyro*, 995 F.3d at 835. But we also find that as a matter of law, a genuine issue of fact remains.

In a Title VII retaliation suit, the plaintiff may submit direct or circumstantial evidence to show that her employer's action was retaliatory and thus not "free from any discrimination based on … religion." 42 U.S.C. § 2000e-16(a). Courts are to consider direct and circumstantial evidence together, not separately. *Ortiz v. Werner Enters.*, 834 F.3d 760 (7th Cir. 2016). Common categories of circumstantial evidence include suspicious timing, ambiguous statements, pretext, and evidence of similarly situated employees who were treated differently. *Coleman v. Donahoe*, 667 F.3d 835, 860 (7th Cir. 2012). In a federal-sector retaliation case, the plaintiff's evidence—whether direct, circumstantial, or both—must permit the factfinder to conclude the employer's retaliatory animus played a part in an adverse employment action.

Another point of clarification: this case proceeds under a cat's paw theory of liability because Huff alleges Wright retaliated against her, yet she concedes that Wright did not have the power to fire her.[8] Under such a theory, an employer may

---

[8] The FAA contends Huff failed to adequately develop a cat's paw theory of liability in the district court. We disagree. Whether Huff used the term

be liable for the retaliatory actions of a subordinate who lacked formal decision-making power if the subordinate's actions were the proximate cause of the adverse employment action. *Vesey v. Envoy Air, Inc.*, 999 F.3d 456, 461–62 (7th Cir. 2021), *cert. denied*, 142 S. Ct. 401 (2021). In other words, "[a]nimus and responsibility for the adverse action can both be attributed to the earlier agent … if the adverse action is the intended consequence of that agent's discriminatory conduct." *Staub v. Proctor Hosp.*, 562 U.S. 411, 419 (2011).[9]

---

"cat's paw" in her summary-judgment response is irrelevant because the substance of her argument was that Wright—motivated by retaliatory animus—influenced the actual decisionmakers.

[9] *Staub* involved the Uniformed Services Employment and Reemployment Rights Act ("USERRA"), which makes an employer liable when antimilitary animus is a "motivating factor" in an employment action. Given the statutory language, the Court observed:

> When a decision to fire is made with no unlawful animus on the part of the firing agent, but partly on the basis of a report prompted (unbeknownst to that agent) by discrimination, discrimination might perhaps be called a "factor" or a "causal factor" in the decision; but it seems to us a considerable stretch to call it "a motivating factor."

*Staub*, 562 U.S. at 418–19. Here, of course, we are dealing with Title VII's federal-sector provision, not USERRA. And as discussed above, the causal connection required between retaliation and an employment decision is less rigorous—if retaliation was a factor in the employment decision, the decision was not "free from any discrimination." 42 U.S.C. § 2000e-16(a). It is possible, then, that a federal employee can prove liability by showing that discriminatory or retaliatory animus played a part in a subordinate's report, recommendation, or similar action, and that action, in turn, played a part in an adverse employment action delivered by a supervisor. Because we resolve this case under *Staub*'s earlier-agent theory, we need not reach this question.

To avoid summary judgment, Huff must identify evidence that would permit a reasonable juror to conclude that Wright proximately caused Huff's termination by actions that were tainted by retaliatory motive. This is no easy feat because she must connect the dots between several points in a bureaucratic process. We see four connections for Huff to make: that (A) Wright retaliated against her by proposing and drafting the noncompliance memo; (B) Wright proximately caused the noncompliance memo to be issued, despite her lack of authority to do so; (C) the proposed removal automatically and foreseeably followed the noncompliance memo; and (D) Huff's termination automatically and foreseeably followed the proposed removal.

**A**

Huff makes three arguments to support her assertion that Wright harbored retaliatory animus against her. First, she contends the FAA's justifications for firing her were pretextual; second, she proffers evidence of statements and conduct by Wright she believes directly demonstrate retaliatory animus; and third, she argues the timing of events was suspicious.

**1**

Huff tries to show pretext in three ways. She maintains that the government's reasons for removing her were "objectively unreasonable." She also points to inconsistent instructions from the FAA. Further, she notes the conflicting deposition testimony about who issued the noncompliance memo and who decided to terminate her.

*Objectively Unreasonable.* A jury may infer pretext when an employer enforces a policy in an objectively unreasonable

way. *See Coleman*, 667 F.3d at 861; *Gordon v. United Airlines, Inc.*, 246 F.3d 878, 889 (7th Cir. 2001); *Stalter v. Wal-Mart Stores, Inc.*, 195 F.3d 285, 290 (7th Cir. 1999); *Williams v. Bristol-Myers Squibb Co.*, 85 F.3d 270, 275 (7th Cir. 1996).

In *Coleman*, the Postal Service fired an employee for violating its rule against threats of violence when the employee admitted to her psychiatrist that she had fantasized about killing her supervisor. 667 F.3d at 841. This court questioned whether the plaintiff's statements amounted to a true threat, though, and held that she "offered substantial evidence that the supposed rule violation was only a pretext for unlawful motives." *Id.* at 861.

*Coleman* cited *Gordon* and *Stalter* for support. In *Gordon*, a flight attendant was terminated after he missed a scheduled flight due to confusion about accommodations and safety regulations. *Gordon*, 246 F.3d at 880–83. This court held that the plaintiff proffered enough evidence of pretext to avoid summary judgment because the rule invoked by the employer was rarely used, ambiguous, and managers interpreted it differently. *Id.* at 889.

In *Stalter*, a Wal-Mart employee was terminated for eating another employee's Doritos in the break room, which were left open on the counter. 195 F.3d at 287–88. The court expressed doubt that snatching a coworker's Doritos reasonably violated Wal-Mart's theft policy, *id.* at 290, and we noted the imbalance of "the severity of the punishment in relation to the alleged offense." *Id.* We metaphorically likened the punishment to "swatting a fly with a sledge hammer." *Id.* So, the case was reversed and remanded to the district court because the plaintiff had raised a genuine dispute of material fact on pretext.

Finally, in *Williams*, the defendant-employer fired the plaintiff-employee for "falsifying records," when he failed to catch an unauthorized signature on a company form. 85 F.3d at 273. But we noted that the company policy "merely require[d] … that the samples card be signed by a licensed medical practitioner." *Id.* at 275. And there was "no reason to suppose that either [company form] was not signed by a physician or other licensed medical practitioner." *Id.* We held that "misinterpretation can be evidence of pretext" and remanded the case for trial. *Id.*

Drawing on *Coleman*, *Gordon*, *Stalter*, and *Williams*, Huff argues that the FAA's interpretation and application of the rehabilitation plan and Order 3910.1D were objectively unreasonable. It cannot be ignored that she was, in essence, fired for sending emails instead of making phone calls on merely five occasions over a one-year period. The FAA responds only briefly, contending that in *Coleman*, *Gordon*, and *Stalter*, the plaintiffs also provided evidence of similarly situated employees who received better treatment. In contrast, Huff has not put forward any comparator evidence. While comparator evidence may be used to show pretext, it is not required. *Coleman*, 667 F.3d at 862. Mobilizing a rarely enforced rule against an employee is evidence of pretext, even without comparators. *See Gordon*, 246 F.3d at 891. Naturally, if a rule is rarely enforced, few employees, if any, would be similarly situated.

Under our case law, a reasonable juror could conclude that the issuance of the noncompliance memo was objectively unreasonable and thus pretextual. Contrary to the FAA's assertion, the rehabilitation plan did not expressly prohibit email communication. The FAA raises *expressio unius*—i.e., the negative-implication canon—which means "expression of one

thing implies the exclusion of others." *See* ANTONIN SCALIA & BRYAN A. GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 107 (2012). As applied here, the FAA contends the rehabilitation plan's provision for telephone communication implicitly barred email communication. We are not persuaded by this argument. At best, the rehabilitation plan was ambiguous as to the method of communication an employee was required to use when requesting medication approval.

The FAA's fallback contention is that Dr. Holmes and Wright clarified any ambiguity in the rehabilitation plan by asking Huff to use the provided telephone numbers to request medication approvals. This argument also fails because one party to a contract cannot modify an ambiguous provision by simply communicating its preferred interpretation to the other party.

Even if the rehabilitation plan prohibited email and required phone calls, the punishment imposed by the FAA was disproportionately severe. *Stalter*, 195 F.3d at 290. Firing an employee for using an email rather than a phone call on several occasions is heavy-handed. Huff also testified during her deposition that she made contemporaneous phone calls along with her emails requesting medication approval. Whether this assertion is credible is a matter best left for trial. In sum, a reasonable juror could conclude that the FAA's interpretation and enforcement of the rehabilitation plan was objectively unreasonable and thus evidence of pretext.

*Inconsistent Instructions.* Huff accuses the FAA of making inconsistent statements about the rehabilitation plan's requirements. To support this claim, she highlights Dr. Ruiz's deposition testimony in which he admitted that he was unaware the plan did not explicitly prohibit email

communications and, conversely, allowed email for other purposes. He appeared to believe that email communication was prohibited across the board. This is pertinent because Wright acted under the auspices of Dr. Ruiz's authority, and he misunderstood the obligations and prohibitions that the rehabilitation plan imposed. A jury could take this into account when considering Wright's responsibility for the noncompliance memo.

*Conflicting Testimony.* Huff points to conflicting evidence about who authorized the noncompliance memo and who made the termination decision. As to the noncompliance memo, Wright, Dr. Ruiz, and Dr. Holmes all testified that someone else made the decision. With no one taking responsibility, the reasoning behind the memo remains unclear, leaving open the possibility that retaliatory animus, not prudential management, drove the memo's issuance. A similar problem plagues the termination decision. Nominally, Huff's supervisor, Smith, decided to fire Huff; he signed the proposed removal. But Smith said that in conference discussions about Huff's fate, "[Wright] was the only one in the whole process" who wanted removal. Because the record contains differing accounts about how the noncompliance and termination decisions were made, a jury could consider the FAA's proffered justifications pretextual.

**2**

Huff asserts that Wright demonstrated retaliatory animus directly through her words and actions. For example, she characterizes Wright's premature email to her assistant about writing a noncompliance memo as evidence Wright harbored animus against her. Similarly, Huff directs us to Wright's influence over the ultimate removal decision; indeed, Smith

testified that Wright was "adamant" about Huff's removal. Huff also accuses Wright of lying about Huff not calling her back on August 24 and giving her inconsistent instructions about the plan's requirements. Add to this list Wright's statement that she suggested an alternate recovery program to Huff (who claims she found that program on her own) and Wright's attempt to leverage possible alternative programs in anticipation of mediation. Finally, Huff cites Wright's actions in routing confidential documents through her personal email address and forwarding them to her husband. All these allegations, explored at trial, could contribute to Huff's overall theory that Wright wanted her fired and took actions consistent with that goal.

**3**

As a final indication of retaliatory animus, Huff argues that the timing—five months—between Wright's submission of an affidavit in the EEO complaint proceedings and the issuance of the noncompliance memo was suspicious. The FAA disputes that the date of Wright's affidavit (March 2017) is relevant and contends that the court should measure from the filing of the informal complaint (October 2016). Under that metric, the time period between Huff's protected activity and her termination was greater than one year.

Regardless, the timeline here does not plainly assist either side. Huff points out that she sent one medication-approval email before her EEO complaint, and it was replied to without objection. Then, after she filed her complaint, objections accompanied her email requests (whether she separately made phone calls or not). Within five months of submitting an affidavit to the EEO counselor—which Wright griped about to her husband, sending him the complaint and affidavit—

Wright initiated a noncompliance memo against Huff. The sequence here is consistent with Huff's theory, but it is not strong supporting evidence. Nonetheless, a jury may consider this evidence when determining pretext.

\*      \*      \*

Taking together (1) the objectively unreasonable interpretation and application of the plan, (2) Wright's statements and conduct, and (3) the sequence of events, a reasonable juror could conclude that Wright initiated a noncompliance memo against Huff at least partly because she filed an EEO complaint against her in July 2016.

**B**

Whether Wright retaliated against Huff by recommending and preparing a noncompliance memo is only the first step for Huff. Recall that her claim is based on a cat's paw theory, which requires her to show that the "ultimate decisionmaker issued an adverse employment action based on the discriminatory animus of another." *McDaniel v. Progress Rail Locomotive, Inc.*, 940 F.3d 360, 370 (7th Cir. 2019). Thus, Huff must show that Wright, who lacked actual authority to issue the noncompliance memo—let alone fire an employee—proximately caused the noncompliance memo's issuance and, eventually, Huff's termination. Huff admits that only the Flight Surgeon's office could authorize the noncompliance memo. But she argues that Wright exerted enough influence on the process to be causally responsible.

The record is ambiguous as to how and to what extent the Flight Surgeon's office was involved in the process. Start with Wright's initial request. After Huff emailed a request for medication approval and excused absence from her recovery

program, Wright emailed Dr. Ruiz, "I am considering giving [Huff] a non-compliance for continuing to email us." Dr. Ruiz responded, "[n]on-compliance and excused for the days she is not at work AFTER she communicates with us in the manner prescribed." Wright replied, "I will prepare a document for your signature."

Yet, the final noncompliance memo signed by Huff only listed Wright and Dr. Schall in the signature block. As discussed above, there was conflicting evidence about who made the final decision. And there is no evidence that Dr. Schall, Dr. Ruiz, or Dr. Holmes reviewed and approved the final version of the memo. If Dr. Schall did in fact sign the memo, it remains unclear why Wright indicated Dr. Ruiz would sign it and why deposition testimony from Wright, Dr. Ruiz, and Dr. Holmes does not identify Dr. Schall as the decisionmaker. In fact, Dr. Ruiz emailed Dr. Schall a week later, with the noncompliance memo as an attachment, and stated "[the letter of non-compliance sent to [Huff] last week." That email does not make sense if Dr. Schall, whose name appears in the memo's caption and signature block, signed the document.

Considering all this evidence, a reasonable juror could conclude that Wright initiated the noncompliance memo with retaliatory animus and proximately caused its issuance.

## C

Next, Huff must establish a link between the noncompliance memo and the proposed removal. The FAA argues that Murphy made an independent assessment, and only then recommended that Smith initiate a removal action. But Murphy's deposition testimony contradicts this. Counsel asked her, "When you were notified by [Wright's department] that there

was a violation by Alice of her [rehabilitation plan], did you have any say in whether or not that actually constituted a violation, or was that out of your hands?" Murphy responded, "It was out of my hands."

Instead, Murphy followed Order 3910.1D's plain language, which mandates the initiation of a removal action if an employee fails to adhere to the terms of his or her rehabilitation plan. Relying solely on the noncompliance memo, Murphy concluded that Order 3910.1D required the FAA to commence a removal action. So, she drafted the proposed removal.

Wright's familiarity with Order 3910.1D would have made her aware that a noncompliance memo would prompt removal proceedings. A reasonable juror could conclude that Wright (1) initiated the noncompliance memo out of retaliatory animus, (2) exerted influence over the nominal decisionmakers, resulting in the issuance of the noncompliance memo, and (3) knew that the proposed removal would automatically follow.

## D

The last link in the causal chain is termination. The proposed removal was not a final decision. Huff was allowed 15 days to reply and offered the opportunity to participate in another rehabilitation program, which would be "favorably considered" for purposes of the removal decision. The notice of proposed removal assured Huff that "[f]ull consideration [would] be given to any reply [she chose] to submit."

Huff's supervisor, Smith, was the nominal decisionmaker. But he expressed doubt about whether the FAA could "sustain a removal for non-compliance regarding making a phone

call." Murphy agreed. Murphy's supervisor, Madison, apparently viewed the situation differently. Though Murphy researched other options, she later reported she was "overruled" because Madison believed the process was "mechanical." All along, Smith testified that Wright was the only person who wanted Huff to be terminated. Reluctantly, he signed off on Huff's termination.

Even if Wright exerted influence on Huff's termination, the FAA insists, Huff severed the chain of causation by declining to enter a "management-referral program"—basically, a second rehabilitation plan. In the FAA's view, the proposed removal notice presented Huff with two options: (1) enter a new rehabilitation program, or (2) be fired; Huff voluntarily chose the latter. But this interpretation is incorrect. The notice expressly offered Huff the ability to submit a reply within 15 days and, in addition, described the option of entering another program to gain favor with her supervisor. Rather than entering a new program, Huff replied through her attorney, as was her right, making many of the same arguments she does here. Even though Huff responded in a permissible way, Wright recommended removal, and Madison opined that the process was mechanical. A reasonable juror could conclude that Huff's termination automatically followed the proposed removal, aided further by Wright's consistent recommendation that Huff be terminated.

## IV. Conclusion

Under the causation standard for federal-sector retaliation claims, a reasonable juror could conclude that retaliatory animus influenced Wright's decision-making and proximately caused Huff's termination. To be clear, a finding of liability under *Babb*'s causation standard would not necessarily entitle

Huff to reinstatement, lost wages, and compensatory damages, all items requested in her amended complaint. *Babb*, 140 S. Ct. at 1177 ("[B]ut-for causation is important in determining the appropriate remedy."). To secure those remedies, Huff must demonstrate that the requested relief "redress[es] the alleged injury." *Id.* (internal quotation marks omitted). We express no view on that question, holding only that a genuine dispute of material fact remains for trial.

For these reasons, we REVERSE the district court's grant of summary judgment and REMAND for proceedings consistent with this opinion.